UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MARIO ESTIVERNE and NATIVIDA
ANTOINE, individually and on behalf of their
infant children, ANDREW ESTIVERNE, DYAN
ESTIVERNE, and MARIO ESTIVERNE, JR.,

                    Plaintiffs,                    **OPINION AND ORDER**

    -against-                        **06 CV 6617 (NG)(RLM)**

DEBRA ESERNIO-JENSSEN, individually and
as physician, LONG ISLAND JEWISH
MEDICAL CENTER, NORTH SHORE - LONG
ISLAND JEWISH HEALTH SYSTEMS, INC.,
and JOHN JOHNSON, individually and as
Commissioner of the New York State Office of
Children and Family Services,

                    Defendants.
-----------------------------------------------------------------X
GERSHON, United States District Judge:

      Plaintiffs Mario Estiverne and Nativida Antoine (the "Adult Plaintiffs"), individually and

on behalf of their infant children, Andrew Estiverne, Dyan Estiverne, and Mario Estiverne, Jr. (the

"Infant Plaintiffs"), bring this action alleging, as against defendants Debra Esernio-Jenssen, M.D.,

Long Island Jewish Medical Center ("LIJ"), and North Shore - Long Island Jewish Health Systems,

Inc. (together, "Medical Defendants"), various violations of federal and state law stemming from

the allegedly improper medical treatment and detention of the Infant Plaintiffs and, as against

defendant John Johnson ("Johnson"), individually and as Commissioner of the New York State

Office of Children and Family Services ("OCFS"), a violation of Adult Plaintiffs' federal due

process right to work in their chosen profession. Plaintiffs also seek attorney's fees from Johnson

with regard to injunctive relief previously granted by this court. Medical Defendants and Johnson

1

move separately to dismiss all claims under Fed. R. Civ. P. 12(b)(6). For reasons set forth below, Defendant Johnson's motion is granted; Medical Defendants' motion is denied in its entirety.

## BACKGROUND

### I. Facts

The factual allegations in plaintiff's complaint are taken as true for purposes of this motion.

On November 27, 2004, Antoine noticed her nine-month-old son, Andrew, favoring his right wrist, which was slightly swollen. She took Andrew to the emergency room of Schneider Children's Hospital ("Schneider"), operated by defendant LIJ.[1] Doctors at Schneider discovered a routine, minor fracture in Andrew's wrist and placed it in a cast. To determine whether he had bone disease, a pediatric orthopedic physician scheduled magnetic resonance imaging ("MRI") of Andrew's wrist for November 29, 2004.

Schneider doctors then asked Dr. Esernio-Jenssen to examine Andrew. The complaint alleges that, during the period November 2004 through September 2005, Dr. Esernio-Jenssen was a physician allegedly under contract with the Administration for Children's Services ("ACS"), a child protective service operated by the City of New York and authorized to investigate complaints of child abuse and neglect, as a medical expert to examine children in ACS's protective custody, to assist and advise ACS regarding the investigation and prosecution of cases of alleged child abuse and neglect, and to testify as an expert in child abuse and neglect cases in the New York family court.[2] During this same period, the complaint alleges, Dr. Esernio-Jenssen was under contract with

_____

[1] Defendant North Shore - Long Island Jewish Health Systems, Inc., is LIJ's parent.

[2] Under New York's Child Protective Services Act (the "Act"), which establishes a comprehensive statutory system and procedural framework for the reporting of suspected child abuse cases, local child protective agencies are responsible for investigating complaints of suspected

LIJ and/or North Shore to examine and treat children who were patients at Schneider. The complaint further alleges the following:

> Although licensed as a physician, defendant Esernio-Jenssen has become a zealot in detecting cases of supposed child abuse and in removing supposedly abused children from their parents. Defendant Esernio-Jenssen is well-known in the professional community for diagnosing children as suffering from child abuse, when the children have not been abused and where the children's medical signs and symptoms are inconsistent with child abuse. . . . Esernio-Jenssen is known for diagnosing children as having been severely shaken, even when the children do not show any medical signs of whiplash shaken infant syndrome, also known as 'shaken baby syndrome.'

According to plaintiffs, on November 29, 2004, Dr. Esernio-Jenssen conducted a hasty, superficial, and medically inadequate examination of Andrew. Dr. Esernio-Jenssen concluded that Andrew's fracture had been caused by child abuse; specifically, one or both adult plaintiffs held Andrew by the arm and shook him so violently that his arm fractured. However, according to plaintiffs, Andrew's fracture was not consistent with child abuse; he showed no medical signs or symptoms of having been shaken, and did not require inpatient care. Rather, they assert, Andrew's injury was "probably incurred accidentally, when [he] fell while learning to walk." Complaint ¶ 52. Dr. Esernio-Jenssen, along with defendants North Shore and LIJ, took Andrew into protective custody, refusing to discharge him to his parents. Dr. Esernio-Jenssen cancelled the MRI and ordered that Andrew be given a "skeletal survey," or a full body x-ray, without plaintiffs' consent and for investigative rather than medical reasons. Also, she reported to the New York State Central Register of Child Abuse and Maltreatment ("Central Register") that she suspected Andrew had been

---

child abuse, neglect, and maltreatment. *See* New York Social Services Law ("N.Y.S.S.L.") §§ 411 *et seq.* ACS is a child protective agency within the meaning of N.Y.S.S.L. §§ 423 and 424.

abused and that Estiverne and Antoine were the perpetrators.[3]  According to plaintiffs, Dr. Esernio-Jenssen knew her allegations of abuse were false or made them with reckless disregard for the truth.

The Central Register forwarded Dr. Esernio-Jenssen's report to ACS for investigation.  On November 29, 2004, ACS assigned the case to its Instant Response Team, which determined that no arrest or removal was necessary because the injury was accidental.  On the same day, however, ACS sent an additional team (the "Second ACS Team") to investigate the allegations of abuse.[4]  The Second ACS Team, together with Dr. Esernio-Jenssen, questioned Antoine about Andrew's condition.  Antoine represented she did not know the cause of Andrew's injury.  Dr. Esernio-Jenssen informed the Second ACS Team that Andrew could not have injured his wrist accidentally and that his injury must have been caused by an adult who grabbed him by the arm and shook him.  Further, Dr. Esernio-Jenssen stated that Andrew's condition was not caused by bone disease.  Plaintiffs assert that, as a pediatrician and not an orthopedist, Dr. Esernio-Jenssen was not qualified to offer such an opinion and, further, that the Second ACS Team knew or should have known that Dr. Esernio-Jenssen was unqualified to give this opinion.

According to the complaint, Dr. Esernio-Jenssen has a long history of giving incorrect and misleading diagnoses to ACS.  Further, plaintiffs assert, the Second ACS Team knew or should have known that Dr. Esernio-Jenssen was an unreliable source of information.

On November 30, 2004, the Second ACS Team asked the Pediatric Radiologist at Schneider

---

[3] While anyone may submit a complaint, certain professionals, including school officials, physicians and police officers, are required to report to the Central Register when "they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child."  N.Y.S.S.L. § 413(1).

[4] The complaint does not indicate why the Second ACS Team was deployed.

who had reviewed Andrew's x-rays, Dr. Barley, whether Andrew's injury was deemed suspicious or indicative of abuse, to which Dr. Barley replied "I didn't say abuse. I'm sticking with my observation of the fracture." That same day, the Second ACS Team took Andrew into the custody of the City of New York and instructed Schneider and Dr. Esernio-Jenssen not to allow adult plaintiffs to remove Andrew from the hospital. Plaintiffs assert that this order was illegal and that defendants knew or should have known of the illegality.

On December 1, 2004, ACS commenced child protective proceedings in New York Family Court, charging that plaintiffs had abused the infant plaintiffs.[5] Based on allegedly false representations made to it, the Family Court ordered Infant Plaintiffs removed from Adult Plaintiffs' custody and placed in foster care. Beginning December 2004 and until August 2005, ACS required Adult Plaintiffs to receive instruction on parenting skills and anger management, and to receive individual psychotherapy before allowing Infant Plaintiffs to be returned to their care. On September 16, 2005, ACS withdrew the Family Court petition against plaintiffs and the case was dismissed.

Meanwhile, on January 25, 2005, ACS notified Adult Plaintiffs that a report had been made against them in the Central Register and found indicated.[6] Plaintiffs were informed they had 90 days

---

[5] The child protective service may at any time commence child protective proceedings against the parents in New York Family Court. N.Y.S.S.L. § 397(2)(b); N.Y. Fam. Ct. Act. § 1032(a).

[6] Within 60 days of receiving the report, the child protective agency must complete its investigation, N.Y.S.S.L. § 424(7), and determine whether "some credible evidence" supports the allegations. N.Y.S.S.L. § 412(12). If so, the report is deemed "indicated"; if not, "unfounded." N.Y.S.S.L. § 424(7). If the report is indicated, the child protective agency must so notify the subjects and inform them of their "rights in regard to requesting that the report be amended or expunged, and their right to a fair hearing." 18 N.Y.C.R.R. § 432.3(k)(1). If the report is unfounded, the child protective service so informs the OCFS, 18 N.Y.C.R.R. § 432.3(k)(2), which

to request expungement, *see* N.Y.S.S.L. § 422(8), which they failed to do. However, nearly a year later, on January 6, 2006, plaintiffs asked Johnson to seal or expunge their records in the Central Register or, in the alternative, provide adult plaintiffs a name-clearing hearing. Because 90 days had passed since Adult Plaintiffs received notice, Johnson denied the request to seal the records.

## II.    Procedural History

Plaintiffs filed the instant complaint on December 13, 2006. In addition to Medical Defendants and Johnson, the complaint also named the City of New York, its commissioner, John Mattingly, and several of its caseworkers and supervisors (the "City Defendants"). On July 5, 2007, the Court dismissed with prejudice the action against the City Defendants pursuant to a stipulation of dismissal between them and plaintiffs.

On July 6, 2007, the court held oral argument on plaintiffs' motion for a preliminary injunction against Johnson in his official capacity seeking an order that the State immediately provide Antoine with a name-clearing hearing. Antoine, representing she was then scheduled to begin a clinical rotation in pediatric nursing in August 2007, argued she would suffer irreparable injury if her prospective employer, upon submitting a mandatory inquiry to the Central Register with regard to her application, was not timely informed that Antoine was *not* the subject of an indicated report.[7] If the State waited to provide a hearing until receiving an inquiry, she argued, the inevitable

_____

in turn notifies the subjects that the report is unfounded and will be sealed. 18 N.Y.C.R.R. §§ 432.3(k)(2), 432.9(b).

[7] As per N.Y.S.S.L. § 424-a(1)(b)(I), the Central Register must disclose an existing report upon inquiry from an employer considering a job applicant for a position involving "regular and substantial contact with children." However, the New York Court of Appeals, following *Valmonte v. Bane*, 18 F.3d 992, 1004 (2d Cir. 1994), has held that "the Due Process Clause of the Federal Constitution requires the Department to substantiate reports of child abuse by a fair preponderance of the evidence before they may be disseminated to providers and licensing agencies as a screening

delay between inquiry and response would, in effect, put that employer on notice of an indicated report. The court found Antoine had shown a clear likelihood of success on the merits of her due process claim and ordered Johnson, *inter alia*, to provide her an immediate hearing on her application to amend and seal her child abuse report in the Central Register and issue a determination by July 31, 2007. *See* Order, July 6, 2007, Docket Entry 67. As a result of this order, Antoine received a hearing which resulted in the amendment of her report from "indicated" to "unfounded."

## DISCUSSION

### I.     Standard of Review

On a motion to dismiss, plaintiff's factual allegations must be accepted as true, and the court must draw all reasonable inferences in favor of plaintiff. *Zinermon v. Burch*, 494 U.S. 113, 118 (1990). The court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, ___ U.S.___, 127 S.Ct. 1955, 1964 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." *Id*. at 1974. This "plausibility

---

device for future employment." *Lee TT v. Dowling*, 87 N.Y.2d 699, 712 (1996). In essence, these decisions require that the post-deprivation hearing mandated by N.Y.S.S.L. § 424-a(2)(d) be provided *before* dissemination of a report. Antoine sought this hearing before, and in anticipation of, her prospective employer's mandatory inquiry.

standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 158 (2d Cir. 2007).

## II.     Claims Against Johnson

Of the thirteen claims asserted in the complaint, only Counts XI, XII, and XIII are against Johnson. In their opposition to his motion to dismiss, plaintiffs withdraw Counts XI and XII. Count XIII alleges that Johnson "has a policy of failing to provide individuals whose names are listed on the Central Register with name-clearing hearings prior to disclosing said names to prospective employers and licensing organizations." Based on this claim, plaintiffs seek damages from Johnson in his personal capacity.[8]  Plaintiffs also seek a declaration that defendant Johnson's practice of denying a name-clearing hearing to plaintiffs violates the First and 14th Amendments.

OCFS has provided plaintiff Antoine a hearing in accordance with this court's order of July 6, 2007 granting plaintiff's request for preliminary injunctive relief. As a result of this hearing, the status of the report concerning adult plaintiffs in the Central Register was amended from "indicated" to "unfounded." Therefore, plaintiffs' request for permanent injunctive relief is moot.

Further, although "[i]n certain circumstances it may be possible for a claim of declaratory relief to survive, notwithstanding the mootness of a companion claim for an injunction," *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996), such circumstances are not present here. Indeed, "[a] litigant may not use the declaratory judgment statute to secure judicial relief of moot questions."

_____

[8] Plaintiffs also allege that, despite *Valmonte*, Johnson continues to deny meaningful pre-deprivation name-clearing hearings when he conducts the *Lee TT* hearing only upon receiving an inquiry from a licensing agency or provider because, in so doing, he ensures a delay between inquiry and response which, plaintiffs argue, alerts the inquirer to the existence of a report.

*Christopher P. v. Marcus*, 915 F.2d 794, 802 (2d Cir. 1990). "In determining whether a controversy has become moot, the relevant inquiry is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.*, quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Here, the controversy between plaintiffs and Johnson is not only without immediacy, but fully resolved. The declaratory relief sought, if granted, would be without practical implication. *Id.*; *see also Browning Debenture Holders' Comm. v. Dasa Corp.*, 524 F.2d 811, 817 (2d Cir. 1975) (where "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed"). Therefore, plaintiffs' request for declaratory relief is also moot.[9]

Accordingly, claims against Defendant Johnson for permanent injunctive and declaratory relief are dismissed as moot. His motion to dismiss these claims is therefore granted, not on the merits, but based on the mootness of plaintiffs' claims.[10]

## II.    Claims Against Medical Defendants

The complaint asserts ten claims against Medical Defendants: Counts I, II, III, V, VII, and

---

[9] "[W]here the offensive conduct is 'capable of repetition, yet evading review,' the rule that mootness strips the court of jurisdiction does not control." *Christopher*, 915 F.2d at 802, quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). "This exception requires at least the possibility that the 'same complaining party would be subjected to the same action again.'" *Id.*, quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). No allegations of that sort are presented here.

[10] Plaintiffs seek attorney's fees in connection with their successful motion for preliminary injunctive relief, *see above* Background § III. *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989) ("the Eleventh Amendment has no application to an award of attorney's fees, ancillary to a grant of prospective relief, against a State"). Defendant's motion to dismiss does not address whether plaintiffs may be entitled to attorney's fees. Plaintiffs may file a properly supported motion for attorney's fees at the appropriate time.

VIII allege violations of plaintiffs' Constitutional rights under 42 U.S.C. § 1983. The remaining claims are under state law: Count IV, malicious prosecution; Count VI, unlawful imprisonment; Count IX, gross negligence; and Count X, professional negligence. Medical Defendants move to dismiss all counts on various grounds.

### A.      The 42 U.S.C. § 1983 Claims

Medical Defendants move to dismiss Counts I, II, III, V, VII, and VIII (the § 1983 claims) solely on the ground that they lack sufficient allegations that, if true, would support the requisite finding of state action. In opposition, plaintiffs argue that Medical Defendants' detention of Andrew from November 29, 2004 to November 30, 2004 rendered them state actors because, during this period, they detained him for child protective, not medical, purposes.

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "The core purpose of § 1983 is 'to provide compensatory relief to those deprived of their federal rights by state actors.'" *Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999), quoting *Felder v. Casey*, 487 U.S. 131, 141 (1988). The "first inquiry, therefore, is whether the actions alleged by the plaintiffs come within the definition of 'under color of' state law." *Carlos v. Santos*, 123 F.3d 61, 65 (2d Cir. 1997), quoting 42 U.S.C. § 1983.

The Second Circuit has addressed the question presented here. *See Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000). The dispute in *Kia P.* began when a toxicology test administered shortly after the infant plaintiff, Mora, was born on March 27, 1993 indicated the presence of methadone

in her urine. Suspecting child abuse or neglect, and fearing that Mora was in danger of suffering from methadone withdrawal, doctors at privately owned Long Island College Hospital refused to discharge her. As a mandated reporter, a hospital social worker notified the Central Register of the positive drug test. The state then notified the New York City Child Welfare Administration ("CWA").[11] However, "on April 6 or 7, 1993," a second test contradicted the first, conclusively finding that Mora's urine did not contain methadone. *Id.* at 753. Although the Hospital cleared Mora for discharge that day, Hospital policy required it to obtain permission from CWA before releasing Mora. On April 8, 1993, "a day or two after the medical clearance had been given," CWA informed the hospital it would not seek custody and permitted discharge. *Id.* Other than the initial drug test, no evidence indicated child abuse or neglect.

Plaintiff in *Kia P.* brought a § 1983 action against the hospital, alleging various due process violations. The Second Circuit agreed with the district court that, "insofar as the Hospital and its employees rendered medical care to Kia P. and newborn daughter Mora, the Hospital was . . . not a state actor." *Id*. at 756, citing *Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982). Thus, actions "taken by the Hospital in its capacity as a private provider of medical care . . . [did] not subject the Hospital to liability under § 1983." *Id*. These actions included "testing Mora's urine for methadone, holding and treating Mora for methadone withdrawal, and medically clearing Mora after the negative confirmatory test." *Id*. However, in addition to its role "as a provider of medical care, the hospital had a discrete and distinguishable role . . . as part of the reporting and enforcement machinery for CWA, a government agency charged with detection and prevention of child abuse and neglect." *Id*. It was in this latter role that the hospital "put a hold on [Mora's] release . . . because of its concern

_____

[11] The CWA is the predecessor to ACS.

about her care in the hands of her mother." *Id*. "[I]nsofar as the Hospital was acting in the latter capacity[,] . . . the Hospital *was* a state actor. *Id*. (emphasis in original).

However, *Kia P*. indicates that, in situations where a hospital's conduct is susceptible to characterization as both private and state action, the private impetus trumps the public for purposes of § 1983. Indeed,

> the refusal of the Hospital to release Mora to her mother for reasons relating to child abuse and child welfare laws did not become effective until the medical release was issued and Mora was no longer being held by the Hospital's doctors for treatment and observation, i.e., on April 6 or April 7.

*Id*. at 757. Thus, "the Hospital's actions in its capacity as a state actor had no effect, and thus did not subject it to liability under § 1983, for the period between Mora's birth and her medical clearance." *Id*. The Second Circuit explained further:

> The Hospital, treating Mora P. as its medical patient, did not declare her ready for release until April 6 or 7. Therefore, from the date of Mora's birth to April 6 or 7, whatever liberty interest Kia P. and Mora P. possessed was being denied by the Hospital as a private actor providing medical care. The Hospital in its role as state actor during that period of time was incapable of depriving, and therefore did not deprive, mother and daughter of liberties that had already been taken away by the Hospital's medical staff as private, professional persons.

*Id*. at 757. In sum, the Hospital was a state actor only during the period between medical clearance and discharge. *Id*. Under *Kia P*., therefore, to determine when, if ever, Medical Defendants became state actors, this court must determine when their refusal to release Andrew to his parents "for reasons relating to child abuse and child welfare laws . . . bec[a]me effective," *id*., i.e., became the sole motivation for Medical Defendants' actions.

As alleged in the complaint, Andrew was admitted to Schneider on November 27, 2004 for

medical treatment. On November 29, 2004, Dr. Esernio-Jenssen allegedly determined that Andrew was the victim of abuse, cancelled the MRI scheduled by her colleagues for medical purposes, filed a child abuse report with Central Register, and ordered a skeletal survey for *investigative*, not medical, reasons while refusing to release Andrew to the custody of his parents. Significantly, the complaint alleges that, as of November 29, 2004, Andrew no longer required medical care. Then, on November 30, 2004, the City of New York instructed Medical Defendants to detain Andrew, which they did until he was removed and placed in foster care.[12]

These allegations, if true, would support a finding of state action under *Kia P.* According to the complaint, the rationale for Medical Defendants' detention of Andrew ceased to be medical necessity when Dr. Esernio-Jenssen cancelled the MRI in light of her suspicion of child abuse, filed a report, and commenced an investigation. At this point, Medical Defendants began "acting in [their] role as an instrumentality of the government" by holding Andrew "as part of the State's effort to detect and prevent child abuse," *id.*, and, as such, became subject to § 1983 as state actors.

Medical Defendants attempt to distinguish *Kia P.* solely on the basis of the following text which, here, unlike in their brief, is quoted in full:

> the Hospital did not hold Mora in its capacity as a state actor until *after* the primary evidence of abuse had been discredited, when the drug test indicated the absence of methadone in Mora's urine and she was medically cleared for release.

*Kia P.*, 235 F.3d at 759 (emphasis in original). According to Medical Defendants, because the evidence of abuse of Andrew was never *discredited*, they never became state actors. However, they

---

[12] The duration of Andrew's detention at Schneider Hospital is unclear from the complaint. However, plaintiffs argue only that the "medical defendants' detention of Andrew from November 29-30, 2004, renders them state actors in [the] present action." Pl. Opp. at 8.

read this quote out of context; that evidence of abuse was, in fact, discredited in *Kia P.* was not relevant to the state action inquiry in that case, but rather to whether, for purposes of substantive due process, the Hospital acted upon a "reasonable basis" when it continued to detain Mora "*after* the primary evidence of abuse had been discredited." *Id.* ("Recognizing the need for unusual deference in the abuse investigation context, we have held that an investigation will pass constitutional muster provided simply that case workers have a reasonable basis for their findings of abuse.") (internal quotations omitted, emphasis in original). Contrary to Medical Defendants' assertions, and as demonstrated above, *Kia P.* teaches that state-actor status is triggered when, notwithstanding *medical clearance* – not the discrediting of evidence – a hospital continues to detain a child "for reasons relating to child abuse and child welfare laws." *Id.* at 757. Thus, Medical Defendants' efforts to distinguish *Kia P.*, limited to the argument considered above, must fail.

Other cases relied on by Medical Defendants are inapposite. In *Thomas v. Beth Israel Hospital, Inc.*, the court held merely that "[t]he fact that Beth Israel was complying with the New York State Child Protective Services Act . . . by reporting suspected child abuse does not mean it acted under color of state law." 710 F. Supp. 935, 940 (S.D.N.Y. 1989); *see also Storck v. Suffolk County Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 942 (E.D.N.Y. 1999) (same). Here, the complaint alleges that Medical Defendants went well beyond reporting suspected child abuse; they investigated it and detained Andrew.

In sum, plaintiffs have sufficiently alleged that Medical Defendants became state actors when the rationale behind their detention of Andrew ceased to be medical necessity and became solely the investigation of child abuse. This period began on November 29, 2004 and appears to have ended sometime between November 30, 2004 and December 1, 2004, when Andrew was apparently

ordered into foster care.[13] Thus, any liability Medical Defendants may face for alleged constitutional violations is limited to that caused by its actions during this period. *See Kia P.*, 235 F.3d at 757. Medical Defendants' motion to dismiss the § 1983 claims is denied.

**B.      Rooker-Feldman**

Counts V and VII allege constitutional violations based on the removal of Infant Plaintiffs from Adult Plaintiffs' custody and the detention of Infant Plaintiffs: Count V is a due process claim; Count VII, a Fourth Amendment search and seizure claim. Medical Defendants argue these claims are precluded by the so-called Rooker-Feldman doctrine because, in order for plaintiffs to succeed on these claims, they assert, this court would have to review and reject the Family Court Order of December 1, 2004 which ordered Infant Plaintiffs into foster care.

"Where a federal suit follows a state suit, the former may be prohibited by the so-called Rooker-Feldman doctrine in certain circumstances." *Hoblock v. Albany County Bd. of Elections*,

---

[13] Medical Defendants point to select parts of the following text from *Kia P.* as authority for their argument that their short detention of Andrew for child protective purposes is insufficient, as a matter of law, to render them state actors:

> We think the Constitution allows the CWA a short time – a day or two in this case – to process the new information provided by the test results, to review Mora's case in light of this new information, to decide whether to authorize Mora's release, and to communicate its decision to the Hospital. The Hospital's holding of Mora pending the outcome of this deliberative process is a reasonable accommodation of the state's compelling interest in protecting children from abuse and neglect. As a matter of law, Kia P.'s rights to substantive due process were not abridged.

*Kia P.*, 235 F.3d at 759. As the full text makes clear, the *Kia P.* court viewed the brevity of Mora's detention, not with regard to whether a finding of state action was warranted, which it previously resolved in the affirmative, *see id.* at 757, but as to whether the detention was reasonable for purposes of substantive due process.

422 F.3d 77, 83 (2d Cir. 2005). The Supreme Court has narrowed Rooker-Feldman, limiting it to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005). *Exxon* requires four elements satisfied before Rooker-Feldman will apply:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court judgment must have been rendered before the district court proceedings commenced.

*Hoblock*, 422 F.3d at 85.

The current action does not invite this court to review or reject the December 1, 2004 Family Court judgment ordering temporary removal of Andrew. As alleged in the complaint, Medical Defendants' detention of Andrew occurred prior to, and ceased upon entry of, the Family Court's judgment. Therefore, Rooker-Feldman does not apply, and Medical Defendants' motion to dismiss these claims pursuant to this doctrine is denied.

## C. Immunity

Medical Defendants argue they are entitled to immunity from plaintiffs' state law claims – Counts IV, V, VI, and IX – under N.Y.S.S.L. § 419 because they acted in good faith and upon a reasonable suspicion of child abuse. Plaintiffs argue that immunity is not available because Medical Defendants' acts resulted from gross negligence or willful misconduct. Medical Defendants reply that plaintiffs' allegations of bad faith are conclusory and cannot withstand a motion to dismiss.

N.Y.S.S.L. § 413 requires certain persons, including physicians, teachers, and social workers, to file a report whenever "they have reasonable cause to suspect that a child coming before them in

their professional or official capacity is an abused or maltreated child." N.Y.S.S.L. § 419 gives

these "mandated reporters" qualified immunity from civil liability in connection with reports of

suspected child abuse made in "good faith."[14] Immunity applies so long as reporters "act within the

scope of their employment and do not engage in willful misconduct or gross negligence." *Lentini*

*v. Page*, 5 A.D.3d 914, 915 (3rd Dept. 2004). A plaintiff may overcome the presumption of "good

faith" with persuasive evidence of bad faith. *See JC v. Mark Country Day School,* 2007 U.S. Dist.

LEXIS 4716, *20 (E.D.N.Y. Jan. 23, 2007). Finally,

> [t]he reporting requirements which trigger the qualified immunity
> provision contained in [N.Y.S.S.L. § 419] are not predicated upon
> actual or conclusive proof of abuse or maltreatment. Rather,
> immunity attaches when there is reasonable cause to suspect that the
> infant might have been abused and when the party so reporting has
> acted in good faith in discharging the obligations and duties imposed
> by the statute.

*Rine v. Chase*, 309 A.D.2d 796, 797 (2d Dept. 2003) (quotation omitted).

Here, plaintiffs have pled facts which, if proven, would establish bad faith and willful

misconduct. In particular, the complaint alleges that Dr. Esernio-Jenssen knew that her report to the

---

[14] N.Y.S.S.L. § 419 provides:

> [a]ny person, official, or institution participating in good faith in . .
> . the making of a report . . . shall have immunity from any liability,
> civil or criminal, that might otherwise result by reason of such
> actions. For the purpose of any proceeding, civil or criminal, the
> good faith of any such person, official, or institution required to
> report cases of child abuse or maltreatment . . . shall be presumed,
> provided such person, official or institution was acting in discharge
> of their duties and within the scope of their employment, and that
> such liability did not result from the willful misconduct or gross
> negligence of such person, official or institution.

Central Register was false when made or, in the alternative, filed her report with reckless disregard for the truth. While this allegation alone may be conclusory, plaintiffs go further by alleging that Dr. Esernio-Jenssen's diagnosis of child abuse was not supported by *any* medical evidence and, further, that she disregarded the medical assessment of a colleague, an orthopedist, who disagreed with her diagnosis that child abuse was the cause of Andrew's injury. The complaint also alleges that Esernio-Jenssen's behavior is part of a common practice; she allegedly "is well-known in the professional community for diagnosing children as suffering from child abuse, when the children have not been abused and where the children's medical signs and symptoms are inconsistent with child abuse." Compl. ¶ 21.

Accepting these allegations as true, as I must, plaintiffs have "nudged their claims across the line from conceivable to plausible." *Bell Atlantic*, 127 S. Ct. at 1974. While "the law allows [mandated reporters] a degree of latitude to err on the side of protecting children who may be suffering from abuse," *Rine*, 309 A.D.2d at 798, the alleged acts, if borne out by discovery, go beyond mere error and amount to willful misconduct. Medical Defendants, therefore, would not be entitled to immunity. *See Zornberg v. North Shore Univ. Hosp.*, 29 A.D.3d 986, 986-87 (2d Dept. 2006). Medical Defendants' effort to rely on *Miriam P. v. New York*, 163 A.D.2d 39 (1st Dept. 1990) (immunity granted to hospital that reported child abuse in good faith) is unavailing because nothing in that case indicates that plaintiffs attempted to rebut the presumption of good faith by alleging willful misconduct or gross negligence as plaintiffs have here.

Thus, because the court cannot determine at this time whether Medical Defendants enjoy immunity under N.Y.S.S.L § 419, plaintiffs may proceed with discovery in order to attempt to prove their allegations of bad faith. Medical Defendants' motion to dismiss Counts IV, V, VI, and IX on

the ground that they are statutorily immune is denied.

**D.      Malicious Prosecution**

Medical Defendants move to dismiss plaintiffs' state law malicious prosecution claim solely on the ground that reporting suspected child abuse does not constitute "initiation" of a judicial proceeding. In opposition, plaintiffs point to allegations in the complaint which they argue, if true, demonstrate that Medical Defendants' actions went beyond mere reporting and included investigation and assisting the ACS caseworkers. These actions, they assert, constitute initiation.

To state a claim for malicious prosecution under New York law, a plaintiff must allege "(1) the initiation of an action by the defendant against the plaintiff, (2) begun with malice, (3) without probable cause to believe it can succeed, (4) that ends . . . in favor of the plaintiff." *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996), citing *Broughton v. State of New York*, 37 N.Y.2d 451, 457 (1975). When a malicious prosecution claim is based on a civil action, the complaint must also allege "some interference with plaintiff's person or property … beyond the ordinary burden of defending a lawsuit." *Id*.

At issue is whether Medical Defendants "initiated" the Family Court proceeding. Both sides agree that

> [t]he mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.

*Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189 (1st Dept. 1999). Under this formulation, the Second Department has noted that,

> Merely giving false information to the authorities does not constitute initiation of the proceeding without an additional allegation or showing that, at the time the information was provided, the defendant

knew it to be false, yet still gave it to the police or District Attorney.

*Lupski v. County of Nassau*, 32 A.D.3d 997, 998 (2nd Dept. 2006).

Thus, plaintiffs' allegation that Dr. Esernio-Jenssen knew her report to the Central Register was false at the time she made it, if true, would be sufficient to support a malicious prosecution claim. For reasons discussed above, *see* Discussion § II(C), this allegation is not merely conclusory. Again, plaintiffs have "nudged [this claim] across the line from conceivable to plausible," *Bell Atlantic*, 127 S. Ct. at 1974, and are therefore entitled to discovery on this claim. *See Joseph v. City of New York*, 2002 U.S. Dist. LEXIS 26361, *13-14 (S.D.N.Y. August 15, 2002) (motion to dismiss malicious prosecution claim denied where "plaintiff alleges that [defendant] both withheld exculpatory information and deliberately provided misleading information to the prosecutor, which resulted in plaintiff's being charged with a crime.").

Medical Defendants' motion to dismiss the malicious prosecution claim is denied.[15]

## E.     Unlawful Imprisonment

Medical Defendants move to dismiss plaintiffs' claim for unlawful imprisonment on the ground that they "have not pled, nor can they show," that Andrew, nine months old at the time the subject events occurred, was conscious of his confinement and did not consent to being confined.

To survive Medical Defendants' motion to dismiss, plaintiffs' claim for unlawful imprisonment must allege that "the hospital intended to confine the child, that the child was conscious of the confinement, that [he] did not consent to the confinement and that the confinement

_____

[15] Several provisions of the N.Y.S.S.L. require mandated reporters to conduct investigation of suspected child abuse and draft reports. *See, e.g.*, N.Y.S.S.L. §§ 411, 413 and 415. Absent willful misconduct or gross negligence, *see* N.Y.S.S.L. § 419; *Lentini*, 5 A.D.3d at 915, mandated reporters are not at risk of liability for malicious prosecution in connection with the discharge of their duty to report.

was not otherwise privileged." *Miriam P. v. New York*, 163 A.D.2d 39 (1st Dept. 1990). At issue here is only whether plaintiffs have sufficiently pled that Andrew was conscious of his confinement.

If borne out by the evidence, plaintiffs' allegation that, as a result of Medical Defendants' allegedly unlawful confinement of Andrew, he "suffered extreme humiliation, pain and suffering, terror, mental anguish and depression" would support a reasonable inference that Andrew was conscious of his confinement. To the extent that Medical Defendants argue that a nine-month-old infant cannot, as a matter of law, be conscious of confinement, the two cases on which they rely for this proposition are inapposite. The *Miriam P.* court dismissed the unlawful imprisonment claim not because the child was incapable of being conscious of confinement, but because defendant hospital "lacked the necessary intent to unlawfully confine the child." *Id.* The court in *Sager v. Rochester Gen. Hosp.* dismissed the unlawful imprisonment claim *during trial* because "there was no proof that this five-month-old child was conscious of her confinement." 169 Misc. 2d 643, 646 (Sup. Ct. Monroe Co. 1996). The *Sager* Court thus dismissed the claim for insufficiency of the evidence, not insufficiency of the pleadings, as I am asked to do here. Because plaintiffs have pled facts which, if true, could give rise to a reasonable inference that Andrew was conscious of his confinement, and because Medical Defendants have produced no case foreclosing such an inference as a matter of law, their motion to dismiss plaintiffs' unlawful imprisonment claim is denied.

**F.    Medical Malpractice**

Medical Defendants move to dismiss plaintiffs' medical malpractice claim on the ground that the complaint fails to allege that Medical Defendants departed from accepted medical practice when Dr. Esernio-Jenssen diagnosed Andrew's wrist injury as a bone fracture and placed it in a cast or that any alleged departure was the proximate cause of Andrew's injury. In opposition, plaintiffs argue

that Medical Defendants misconstrue the malpractice claim. As they see it, Medical Defendants misdiagnosed *child abuse* as the external cause of Andrew's wrist injury; this misdiagnosis proximately caused Infant Plaintiffs' "nine-month separation from their parents and the malicious prosecution of adult plaintiffs for child abuse." Medical Defendants offer no reply.

"The requisite elements of proof in a medical malpractice action are a deviation or departure from accepted practice and evidence that such departure was a proximate cause of injury or damage." *Wiands v. Albany Med. Ctr.*, 29 A.D.3d 982, 983 (2d Dept. 2006). The Complaint alleges that Medical Defendants "had an obligation to provide infant plaintiff Andrew with necessary and competent medical and therapeutic treatment" and that they failed to do so. Medical Defendants fail to identify why plaintiff's medical malpractice claim is insufficient. Upon review of the complaint, I find plaintiff's allegations are sufficient. Medical Defendants' motion is denied.[16]

### G.  Supplemental Jurisdiction

As the Second Circuit has observed, supplemental jurisdiction has its origins in the doctrine of pendent jurisdiction, discussed by the United States Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-29 (1966), and provides that a district court has jurisdiction "'over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case derive from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *Valencia v. Lee*, 316 F.3d 299, 304-05 (2d Cir. 2003), citing *Gibbs*, 383 U.S. at 725. However, a district court may exercise

---

[16] The court assumes for purposes of this motion that Dr. Esernio-Jenssen's diagnosis of the cause of Andrew's injury affected the course of his treatment and that Infant Plaintiffs' nine-month separation from their parents is an injury cognizable in a medical malpractice claim. Medical Defendants have produced no authority to the contrary.

"considerable discretion over what state law claims it will include within its supplemental jurisdiction in a particular case," *see Cushing v. Moore*, 970 F.2d 1103, 1110 (2d Cir. 1992), and may decline to exercise its supplemental jurisdiction if

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Because plaintiffs' state law claims arise out of the same nucleus of operative fact as their federal claims, and because the state law claims neither predominate in this action nor raise particularly novel or unsettled issues of New York law, the Court shall exercise its supplemental jurisdiction over plaintiffs' state law claims (Counts IV, VI, IX, and X). Medical Defendants' motion to dismiss these claims for lack of jurisdiction is therefore denied.

## CONCLUSION

For the reasons set forth above, Defendant Johnson's motion to dismiss is granted as plaintiffs' claims against him have become moot; Medical Defendants' motion to dismiss is denied in its entirety.

SO ORDERED.

    */S/ Nina Gershon*
**NINA GERSHON**
**United States District Judge**

**Dated: July 31, 2008**
**Brooklyn, New York**