UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MARIO ESTIVERNE and NATIVIDA
ANTOINE, individually and on behalf of their
infant children, ANDREW ESTIVERNE, DYAN
ESTIVERNE, and MARIO ESTIVERNE, JR.,

Plaintiffs,

-against-

DEBRA ESERNIO-JENSSEN, individually and
as physician, LONG ISLAND JEWISH
MEDICAL CENTER, NORTH SHORE - LONG
ISLAND JEWISH HEALTH SYSTEMS, INC.,
and JOHN JOHNSON, individually and as
Commissioner of the New York State Office of
Children and Family Services,

Defendants.

-------------------------------------------------------------X



☆ DEC 2 2011

**OPINION AND ORDER**

06 CV 6617 (NG) (RLM)

GERSHON, United States District Judge:

Plaintiffs Mario Estiverne and Natividad Antoine (the "Adult Plaintiffs"), individually and

on behalf of their infant children, Andrew Estiverne ("A.E."), Dyan Estiverne, and Mario

Estiverne, Jr. (collectively, the "Infant Plaintiffs"), bring this action, under 42 U.S.C. § 1983,

alleging that defendant Debra Esernio-Jenssen, M.D., and her employers, defendants Long Island

Jewish Medical Center ("LIJ"), and its parent corporation, North Shore - Long Island Jewish

Health Systems, Inc. ("Hospital Defendants"), violated Adult Plaintiffs' Fourteenth Amendment

rights, as well as Infant Plaintiffs' Fourth and Fourteenth Amendment rights, by improperly

detaining and testing A.E., as well as working with the State to petition for the removal of Infant

Plaintiffs from Adult Plaintiffs' custody. Plaintiffs also bring, under New York state common

law, claims for false imprisonment, malicious prosecution, medical malpractice, and gross

negligence. Defendants now move, under Rule 56 of the Federal Rules of Civil Procedure, for

1

summary judgment on all claims. For the reasons set forth below, defendants' motion is granted in part and denied in part.

## FACTS

Unless otherwise noted, the following facts are undisputed.

On November 27, 2004, plaintiff Antoine brought her son, A.E., then nine months old, to the emergency room at Schneider Children's Hospital ("Schneider"), which is operated by LIJ. Antoine reported to the doctor at Schneider that A.E. had been favoring his right wrist, which was slightly swollen. Antoine also reported that A.E. had been running a fever over the prior week, and had recently recovered from a viral infection. *See* A.E. Medical Records, Defs.' Ex. E, at 7–8. Although neither Antoine nor Estiverne could provide an explanation for their son's injuries, which doctors estimated to be 7–10 days old, Antoine did report that A.E. had been learning to stand, would fall on occasion, and that he was at times under the care of his babysitter. *Id.* at 8. After an x-ray, laboratory tests, and a physical exam, the Emergency Room Attending doctor diagnosed A.E. with a radius and ulna buckle fracture, with periosteal elevation. *Id.* at 10. The E.R. doctor recommended that the hospital rule out osteomyelitis,[1] and found that there was a "low suspicion of abuse." *Id.* at 8, 27. At least three additional physicians at Schneider, including an orthopedist and a Pediatric Resident who were consulted, recommended an MRI to rule out osteomyelitis.[2] The orthopedist, like the E.R. doctor, found a "mod/low probability [of] abuse/neglect." *Id.* at 27, 32. By 9:15 p.m. on November 27, A.E.'s

---

[1]    Osteomyelitis is an infection of the bone and can be a reason for a bone break. Osteomyelitis presents as a swollen, painful limb, and is sometimes accompanied by an elevated temperature and white blood cell count. *See* Wolpin Dep. Tr., Pls.' Ex. 2, pp. 29, 34.

[2]    An additional physician, Dr. A. Sivitz, whose title is unidentified, was consulted and agreed that the hospital should "await [the] MRI for further management." A.E. Medical Records, Defs.' Ex. E, at 27. There are several additional notations in A.E.'s medical records recommending an MRI to rule out osteomyelitis, although it is unclear which doctors made the entries.

wrist was in a splint, and the immediate symptoms of his fracture had been treated. An MRI was scheduled for the morning of November 29.

After A.E.'s initial treatment, he was admitted to the hospital for further testing. The parties strongly dispute the underlying purpose for A.E.'s admission. Plaintiffs have presented evidence that A.E. was admitted for purposes of investigating abuse, including notes of the Pediatric Resident present on November 27, which stated, "Dr. Nerwin contacted to discuss possible abuse. He suggested skeletal survey and optho consult . . . Will consider skeletal survey for Monday morning." A.E. Medical Records, Defs.' Ex. E, at 27. Plaintiffs also submitted an Intake/Admission Form for a follow up visit A.E. had at Schneider on December 15, 2004. On the form, on the line titled "Prior hospitalizations or surgery," the doctor wrote that A.E. had been previously admitted to Schneider to "R/O [rule out] child abuse." *See* A.E. Intake/Admission Form, Pls.' Ex. 16, at 2–3. Also, on the same form, under "History of Present Illness," the doctor wrote "Admitted to LIJ 11/27/04 for R/O abuse." *Id.*

In contrast, defendants assert that A.E. was admitted for purely medical reasons. They point to the testimony of Dr. Dan Barlev, the Attending Radiologist on A.E.'s case, who testified that he suggested a skeletal survey not to rule out abuse, but rather, because, when he encounters a fracture without an appropriate clinical history, "it's possible that there might be an additional fracture or fractures elsewhere" that would need to be treated. Barlov Dep. Tr., Defs.' Ex. F, at 29:1–15. They also present, among other evidence, A.E.'s discharge summary, dated December 1, 2004, to establish that A.E. was not medically cleared until that date.

Plaintiffs argue that there is a factual issue as to whether A.E.'s initial admission to the hospital was for medical reasons, asserting that, because his arm was put in a splint in the E.R., admission was not medically necessary and occurred only for the hospital to investigate abuse.

However, the record evidence—including evidence on which plaintiffs themselves rely—is to the contrary and establishes at least the mixed purpose of admission. An MRI, which plaintiffs admit was a medically necessary test, was ordered to rule out osteomylitis. Indeed, plaintiffs repeatedly assert that the cancellation of the MRI, discussed further below, shows that the hospital was not interested in a medical explanation, but rather, was interested only in investigating abuse. Because plaintiffs agree that the MRI was scheduled for medical purposes, and because plaintiffs have produced nothing to contradict the evidence that A.E.'s admission was at least partially in order to conduct the MRI, the undisputed documentary evidence shows that, at least until the morning of November 29 (when the MRI was cancelled), A.E.'s admission to Schneider had at least a mixed purpose.

The only testing performed on A.E. between November 27, the date of his admission, and November 29, was an ophthalmology exam, which tested for various forms of eye trauma. Under "Reason for Consultation," the ophthalmologist, after describing A.E.'s injury, wrote "R/O child abuse/shaken baby." A.E. Medical Records, Defs.' Ex. E, at 47. The testing showed no signs of eye trauma. *Id.* Defendants assert that Adult Plaintiffs consented to this test as well as the tests that would follow. Adult Plaintiffs do not dispute consent for *medical purposes*, but there is no evidence that they consented to admission and testing for purposes of an *abuse investigation*, if that was the purpose of the testing. Indeed, the consent form that defendants point to expressly states that plaintiff Antoine was consenting to treatment necessary for A.E.'s "care."

On November 29, defendant Jenssen, head of Schneider's Child Protective Team, was notified of the case. Also on November 29, the MRI, which had been scheduled to rule out

osteomyelitis, was cancelled.[3]  Instead of the MRI, Jenssen ordered several other tests, including the previously recommended skeletal survey, a head CT, which required sedation, a variety of blood tests, and an additional x-ray.  *See* Jenssen Consultation Form, Defs.' Ex. E, at 48–50.  The tests revealed no signs of additional injury or abuse.  Defendants do not dispute that, other than the fracture itself, its unexplained nature, and the possibility that it was 7-10 days old, there was no additional injury or indication of abuse.  Indeed, Schneider's Pediatric Resident, on November 28, observed that "Parents do not exhibit signs of poor bonding or parenting @ this time."  A.E. Medical Records, Defs.' Ex. E, at 28.

On November 29, Jenssen filled out a Form 2221A "Report of Suspected Child Abuse or Maltreatment."  This report was filed with the New York State Office of Children and Family Services.[4]  Once such a report is filed, the Administration for Children's Services ("ACS"), a child protective service operated by the City of New York and authorized to investigate complaints of child abuse and neglect, was required to investigate the report.[5]  ACS began its investigation the same day.

In determining whether to file a petition for removal of Infant Plaintiffs, ACS consulted defendant Jenssen regarding A.E.'s injuries.[6]  Despite the fact that other doctors disagreed, *see* ACS Interview Report, Defs.' Ex. 5, at 3; Jenssen Dep. Tr., at 105, Dr. Jenssen advised ACS that

---

[3]  The parties dispute who cancelled the MRI.  Plaintiffs assert that defendant Jenssen cancelled the test, and submit Jenssen's November 29 notes, which state "cancel MRI." Defendants assert that Dr. David Godfried, the Attending Pediatric Orthopedic, cancelled the test, and present his testimony in support of their assertion.

[4]  Certain professionals, including school officials, physicians and police officers, are required to report to the Central Register when "they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child."  New York Social Services Law § 413(1).

[5]  Under New York's Child Protective Services Act, ACS is responsible for investigating complaints of suspected child abuse, neglect, and maltreatment.  N.Y. Comp. Codes, R. and Regs. tit. 18, § 432.2(b)(1).

[6]  As discussed further, below, the parties dispute the level of ACS's reliance on Jenssen's opinions.

A.E. "did not have enough body mass to fracture his own bone from a simple household fall" and that it was "impossible for him to injure himself." *See* Jenssen Consultation Form, Defs.' Ex. E, at 50; ACS Investigation Progress Notes, Pls.' Ex. 7, at 118. Plaintiffs also present evidence, including ACS caseworker testimony and case notes, that Jenssen "concluded that [A.E.'s] fracture was consistent with a 'grab and shake.'" *See* Goodwine Dep. Tr., Pls.' Ex. 4, at 17; ACS Investigation Progress Notes, Pls.' Ex. 7, at 118. Jenssen denies that she ever used the term "grab and shake." ACS found no other evidence, either in Adult Plaintiffs' home or at the children's school, that was suggestive of abuse.

On November 30, ACS put a "social hold"[7] on A.E., and, on December 1, 2004, it initiated child protective proceedings in New York Family Court. That same day, the court ordered that (all three) Infant Plaintiffs be temporarily removed from Adult Plaintiffs' custody and placed in the custody of ACS. Both the removal petition filed by ACS and the removal order issued by the court recite Dr. Jenssen's alleged assessment that A.E.'s injuries were consistent with the infant being "grabbed and shaken." *See* ACS Pet. for Removal, Defs.' Ex. B, at 172, 178, and 183; Family Court of the State of New York Removal Order, Defs.' Ex. M, at 162. ACS then placed Infant Plaintiffs with family members, and, when the family members became unable to provide care for Infant Plaintiffs, with foster parents.

The parties dispute defendants' role in ACS's investigation and decision to file a removal petition. Plaintiffs assert that defendant Jenssen was the moving force behind both. In support

---

[7] The parties do not define "social hold." However, under New York law:
a designated employee . . . of social services . . . shall take all appropriate measures to protect a child's life and health including . . . taking or keeping a child in protective custody without the consent of a parent or guardian if such person has reasonable cause to believe that the circumstances . . . are such that continuing in his or her place of residence . . . presents an imminent danger to the child's life or health.
New York Social Services Law § 417.

of their argument, plaintiffs present evidence that ACS filed its petition "based upon Dr. Jenssen's assessment . . . [that] the child could not have injured himself [accidentally]"; that if "Dr. Jenssen said there was child abuse, then ACS filed a petition"; that Jenssen recommended the removal of A.E.; and that the "[Schneider] child protective team, in unison with ACS, made the determination to take the case to court." *See* Lafond-Favieres Dep. Tr., Pls.' Ex. 9, at 22, 52; Goodwine Dep. Tr., Pls.' Ex. 4, at 29–30; Ferguson Dep. Tr., Pls.' Ex. 10, at 42.

In contrast, defendants assert that they merely satisfied their statutory obligation and deny having any involvement in the decision to remove Infant Plaintiffs from Adult Plaintiffs' home. Defendants present evidence that ACS caseworkers made the final decision to remove Infant Plaintiffs, that neither Schneider nor Jenssen made the decision to file the petition in Family Court, and that ACS does not rely exclusively on doctor's opinions when determining whether to file a petition. *See* Goodwine Dep. Tr., Defs.' Ex. O, at 68-71; Lafond-Favieres Dep. Tr., Defs.' Ex. P, at 35–38, 70.

Infant Plaintiffs remained in the custody of family members and foster parents until September 16, 2005, when, after a full investigation and consultation with other doctors at Schneider, as well as independent experts, ACS voluntarily withdrew the petition. Plaintiffs have presented evidence, including expert testimony, that the ultimate cause of A.E.'s fracture was osteomyelitis. *See* Wolpin Dep. Tr., Pls.' Ex. 2, at 63.

## DISCUSSION

The complaint asserts ten claims against defendants: Counts I, II, III, V, VII, and VIII allege violations of plaintiffs' constitutional rights under 42 U.S.C. § 1983. The remaining claims are under New York state law: Count IV, malicious prosecution; Count VI, unlawful

imprisonment; Count IX, gross negligence; and Count X, medical malpractice. The identification of which claims are brought by which plaintiffs will be made below.

## I.    Summary Judgment Standard

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *Id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Nor may the non-moving party "rest upon the mere allegations or denials of his pleading." Fed. R. Civ. P. 56(e). Rather, the non-moving party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–252 (1986) (stating that the "mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find [for the non-moving party]").

## II.    Plaintiff's Federal Constitutional Claims Under § 1983

For purposes of plaintiffs' constitutional claims, there are two distinct courses of conduct the court must consider: (1) Defendants' admission, detention, and testing of A.E. between the

period of November 27, 2004 and December 1, 2004; and (2) Defendants' role in ACS's investigation.[8]

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution of the United States." *K&A Radiologic Tech. Servs. Inc. v. Comm'r of the Dept. of Health*, 189 F.3d 273, 280 (2d Cir. 1999) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)). "The core purpose of § 1983 is 'to provide compensatory relief to those deprived of their federal rights by state actors.'" *Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999) (quoting *Felder v. Casey*, 487 U.S. 131, 141 (1988)). The "first inquiry, therefore, is whether the actions alleged by the plaintiffs come within the definition of 'under color of' state law.'" *Carlos v. Santos*, 123 F.3d 61, 65 (2d Cir. 1997) (quoting 42 U.S.C. § 1983).

## A.    Whether Defendants Are State Actors Under § 1983

Defendants argue that A.E. was admitted and retained at Schneider for purely medical purposes, and therefore they did not act as state actors while holding him. Likewise, defendants argue that, in cooperating with ACS in its investigation, they merely fulfilled their statutory obligation and had no involvement in the decision to petition for removal of Infant Plaintiffs. In opposition, plaintiffs argue that A.E. was admitted to Schneider for purely investigatory purposes and that defendant Jenssen was the moving force behind ACS's investigation and decision to petition the court for removal of Infant Plaintiffs.

### 1.    Defendants' admission and testing of A.E.

---

[8]    Plaintiffs have expressly stated that they are *not* bringing a claim against defendants based on defendants' filing of a Form 2221A Report of Suspected Abuse with the State Central Register. Rather, their claims are based solely on defendants' conduct both before and after the filing of this form.

The Second Circuit has squarely addressed the issue of state action when a hospital and its doctors detain a child they believe may have been abused. When a private hospital admits a child for medical reasons, the hospital is not subject to liability under § 1983, even if concerns of abuse partially inform the decision. *See Kia P. v. McIntyre*, 235 F.3d 749, 756–57 (2d Cir. 2000). However, once a child is no longer being held for any medical treatment, and a hospital continues to detain the child for purely investigatory reasons, it becomes a part of the "reporting and enforcement machinery" of ACS and is subject to § 1983 liability. *Id.*

In *Kia P.*, the defendant hospital admitted a newborn infant after her urine tested positive for methadone, as methadone withdrawal is a potentially fatal condition. The hospital then sent the urine sample to a second laboratory for confirmatory testing. In the interim, the hospital contacted the New York City Child Welfare Administration ("CWA"), which initiated an investigation and placed the infant on a social hold.[9] Although the confirmatory test revealed that the infant did not in fact have methadone in her urine, thereby resulting in a medical clearance for discharge, the hospital did not immediately release her. Instead, it sought release approval from the CWA, which, after a day or two delay, informed the hospital that it could release the infant.

The Second Circuit found that there was "no dispute that the hospital had two reasons" for retaining the infant: namely, the medical staff believed the child was suffering from a potentially fatal condition, and also in order to comply with hospital and CWA policies regarding suspicion of abuse. The Court held that, insofar as the hospital was acting pursuant to the latter concerns, it had a "discrete and distinguishable role . . . as part of the reporting and enforcement machinery for CWA, a government agency charged with detection and prevention of child abuse and neglect." *Id.* In this role, therefore, it was a state actor. The court went on to find, however,

---

[9]     CWA is the predecessor to ACS.

that "the refusal of the Hospital to release [the infant] to her mother for reasons relating to child abuse . . . did not become effective until the medical release was issued and [the infant] was no longer being held . . . for treatment and observation." *Id.* at 756. Therefore, until the infant was medically cleared for discharge, "the Hospital's actions . . . did not subject it to liability under § 1983." *Id.* Thus, under *Kia P.*, this court must determine when, if ever, investigation of child abuse became the sole purpose for A.E.'s detainment. [10]

As discussed above, there is undisputed evidence that, initially, A.E.'s admission was at least partially motivated by medical considerations—namely, so that he could undergo an MRI to rule out osteomyelitis. Therefore, the record establishes that, prior to the MRI's cancellation, which the parties do not dispute occurred sometime on November 29, 2004, A.E. was being held for medical, or mixed purposes.

On the morning of November 29, the MRI was cancelled, and a battery of other tests were performed. Although A.E. had not yet been given a formal medical discharge, plaintiffs have presented evidence that the sole purpose of this testing was to rule out abuse, and therefore A.E. should have been cleared for discharge. Therefore, with regard to the period of November 29 through December 1, plaintiffs have presented a genuine issue of material fact as to whether defendants were acting under color of state law by detaining A.E. solely for purposes of investigating abuse.

---

[10]     There is some uncertainty, in *Kia P.*, as to exactly when a private hospital becomes a state actor. On one hand, the Court found that, initially, the hospital was holding the infant for mixed purposes, one of which (*i.e.*, its concern about abuse) rendered it a state actor. The Court found, however, that because the other purpose was for medical treatment, "the hospital's actions in its capacity as state actor *had no effect.*" *Kia P.*, 235 F.3d at 757 (emphasis added). Later in the opinion, however, while discussing the plaintiffs' Fourth Amendment claims, the Court stated that "the hospital was *not* a state actor until [the infant] was medically cleared" but was still being detained. *Id.* at 762 (emphasis added). Regardless of the formulation used, it is clear that a private hospital is not liable under § 1983 during the time when it is holding an infant both for treatment and out of concerns about abuse.

## 2.    ACS's petition for court-ordered removal

Likewise, plaintiffs have produced sufficient evidence to create an issue of fact as to whether defendants acted under color of state law with regard to their role in ACS's decision to seek custody of Infant Plaintiffs. A private party is liable under § 1983 if it is a "willful participant in joint activity with the State or its agents." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). Mere cooperation with a state official or investigatory agency, however, is insufficient to establish joint activity. *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998); *San Filippo v. U.S. Trust Co. of N.Y.*, 737 F.2d 246, 252, 256 (2d Cir. 1984). Rather, to prove joint activity, a plaintiff must show: "(1) an agreement between . . . a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

Although defendants argue that they merely cooperated with ACS, as they are required by law to do, plaintiffs have presented evidence which, if accepted by a trier of fact, suggests that defendants went beyond their statutory duties as mandatory reporters. Namely, plaintiffs have submitted evidence that Dr. Jenssen was the driving force behind ACS's decision to initiate removal proceedings against Adult Plaintiffs. Plaintiffs presented ACS caseworker testimony that Jenssen recommended removal of A.E., that she diagnosed A.E.'s injuries as consistent with being "grabbed and shaken," that if she had not made such a diagnosis, Infant Plaintiffs would not have been removed from their home, that ACS always follows the recommendations of Jenssen, and, perhaps most importantly, that ACS made the decision to file a petition "in unison" with Jenssen and the Schneider Child Protection Team. *See* Goodwine Dep. Tr., Pls.' Ex. 4, at 41, 90.

The cases relied upon defendants to support their argument that they were not state actors are inapposite. In *San Filippo*, the plaintiff brought a § 1983 action against both state and private actors, alleging, *inter alia*, that the private and state defendants conspired to maliciously prosecute him. In granting the private defendants' motion for summary judgment, the court found that "[t]here [was] no evidence whatsoever suggesting that [the private defendants] ever initiated any contact with the state concerning this case, or ever urged the state to prosecute [the plaintiff]." *San Filipo*, 737 F.2d at 256. Likewise, in *Scotto*, the plaintiff alleged that the private defendants conspired with state parole officials to revoke plaintiff's parole. In granting summary judgment for the private defendants, the court held that the evidence "did no more than demonstrate that [the private defendants] cooperated with [the parole officer's] investigation into [plaintiff's] allege parole violation." *Scotto*, 143 F.3d at 114–15.

Here, plaintiffs have presented evidence that defendants went well beyond cooperation with ACS. Although defendants have presented countervailing evidence that ACS made their decision independently, plaintiffs' evidence, viewed in the light most favorable to them, creates a genuine issue of material fact as to whether defendants conspired with ACS in determining to file a removal petition against Adult Plaintiffs.

### B.  Whether Hospital Defendants Are liable For The Actions of Dr. Jenssen With Regard To Plaintiffs' § 1983 Claims

Plaintiffs have presented sufficient evidence to proceed to trial on the issue of whether Hospital Defendants are responsible for the alleged constitutional violations in question. Like government employers, private employers are not responsible, under a theory of *respondeat superior*, for the constitutional torts of their employees. Rather, plaintiffs must show that "'action pursuant to official . . . *policy* of some nature caused a constitutional tort.'" *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1999) (quoting *Monell v. Dept. of*

*Social Serv. of the City of N.Y.*, 436 U.S. 658, 691 (1978)) (emphasis in the original). Therefore, Hospital Defendants are not liable for the alleged constitutional violations of Dr. Jenssen unless some hospital policy caused plaintiffs' injuries.

In opposition to summary judgment, plaintiffs first argue that Hospital Defendants had an unconstitutional written policy that allowed defendants to "detain any child for non-medical reasons, without the consent of the parent." Pls.' Mem. of Law, at 40. Plaintiffs, however, leave out a critical component of Hospital Defendants' policy. The full policy states, in pertinent part, that defendants may "take the child into protective custody when there is *reasonable cause* to believe that . . . continuing his/her place of residence . . . presents an *imminent danger to the child's life or health.*" LIJ Child Abuse and Neglect Policy, Pls.' Ex. 13, at 3 (emphasis added). As discussed further below, the requirements of "reasonable cause" and "imminent danger" are in accordance with constitutional requirements for detaining a potentially abused child. Moreover, the policies provide that, upon removal, hospital doctors must immediately contact the state abuse hotline, which triggers an ACS investigation. Likewise, plaintiffs have offered no evidence of deliberate indifference on behalf of the hospital. *See Smiley by Smiley v. Westby*, 1994 U.S. Dist. LEXIS 13413, at *49–51 (S.D.N.Y. Sept. 20, 1994) (holding that, to proceed on a claim of deliberate indifference for failure to promulgate policy, a plaintiff must present evidence that the defendant "made a conscious choice not to promulgate policies necessary" to prevent constitutional deprivations).

Although plaintiffs have failed to establish an official hospital policy that deprived them of their constitutional rights, Hospital Defendants may nevertheless be liable if plaintiffs establish that defendant Jenssen was a hospital policymaker. Under § 1983, employer liability may be imposed for a single decision by government policymakers. *See Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 480 (1986). Although official employer policy often takes the form of formal rules and understandings, employers "frequently choose[] a course of action tailored to a particular situation[,] and . . . [i]f the decision to adopt that particular course of action is properly made by that [employer]'s authorized decisionmakers, it surely represents an act of official government policy . . . ." *Id.* All that is required is that the policymaker in question has final authority to establish policy.

Here, plaintiffs have asserted, and defendants do not dispute, that defendant Jenssen is the head of Schneider's Child Protective Services Team. Plaintiffs have presented evidence that hospital staff referred to and deferred to Jenssen in determining a course of action, that ACS always followed Jenssen's recommendations, and that ACS made its decision to remove A.E. "in unison" with Jenssen. Furthermore, defendants have presented no evidence to suggest that anyone but Jenssen had final decision-making authority in this area. Viewing the inferences from this evidence in the light most favorable to plaintiffs, plaintiffs have created a triable issue of fact as to whether defendant Jenssen was the final policymaker for Hospital Defendants with regard to the handling of potential child abuse victims.

**C.    Procedural Due Process**

Plaintiffs assert that defendants violated their Fourteenth Amendment right to procedural due process by detaining A.E. without a prompt post-deprivation hearing. Defendants argue that even if they were state actors, their short-term detention of A.E. was reasonable.

Parents have a constitutionally protected liberty interest in the care, custody, and management of their children, and children have a similarly protected liberty interest in not being separated from the "intimacy of daily family association." *Kia P.*, 235 F.3d at 759 (internal quotations and citations omitted). Therefore, as a general rule, before parents and children are

deprived of this liberty interest, a court proceeding must ordinarily be afforded to them. *See Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999). However, when a child is already in the custody of the state actor when the deprivation occurs, a pre-deprivation hearing is impractical, if not impossible. In such a case, the state actor has a duty to initiate a prompt post-deprivation hearing after the child has been removed from custody. *Kia P.*, 235 F.3d at 760. The sufficiency of post-deprivation procedural safeguards "typically will not depend on the quantum of evidence possessed by the government." *Kia P.*, 235 F.3d at 759.

"[S]hort lived and relatively non-disruptive removal does not violate [procedural] due process." *Orlik v. Duchess Cnty.*, 603 F. Supp. 2d 632, 646 (S.D.N.Y. 2009); *see also Kia P.*, 235 F.3d at 760–61 (approving, as a matter of law, a two day delay); *Cecere v. City of N.Y.*, 967 F.2d 826 (2d Cir. 1992) (approving a "brief" four-day delay without a post-deprivation hearing). As discussed above, *supra* at 4, the record establishes that, prior to the cancellation of the MRI on November 29, A.E. was being held for mixed purposes. Beginning on November 29, however, there is an issue of fact as to whether defendants were holding A.E. for purely investigatory reasons. The same day (the 29th) they filed the required report of suspected child abuse. Also the same day, ACS began its investigation. The very next day, ACS put a social hold on A.E., and within two days, Family Court proceedings were commenced. Moreover, during this period, Adult Plaintiffs had unfettered access to A.E. A two day delay is well within the time this Circuit "allows child welfare officials to permit them to determine what action should be taken after parent and child have been separated." *Kia P.*, 235 F.3d at 760–61.

Therefore, defendants' motion for summary judgment dismissing plaintiffs' procedural due process claims is granted.

## D. Adult Plaintiffs' Substantive Due Process Claims[11]

Plaintiffs claim that defendants violated their right to substantive due process under the Fourteenth Amendment, both through their admission of A.E. at Schneider after he was medically ready for discharge, and through a conspiracy with ACS to petition for a court-ordered removal of Infant Plaintiffs. Defendants claim that they had a reasonable basis for admitting and detaining A.E. at Schneider and that they were not involved in ACS's decision to remove Infant Plaintiffs. They further contend that, even if their actions did violate plaintiffs' rights, they are entitled to qualified immunity.

### 1. A.E.'s removal and retention by defendants

Substantive due process protects individuals against arbitrary government action. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). To establish a violation of substantive due process, a plaintiff must demonstrate that the state action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Southerland v. City of N.Y.*, 2011 U.S. App. LEXIS 11942, at *56 (2d Cir. June 10, 2011). The interference with a protected right must be such that "the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.*

Substantive due process also provides heightened protection against governmental interference with certain fundamental rights and liberty interests, including the interest of a

---

[11]  Plaintiffs' complaint can be read as bringing substantive due process claims on behalf of both Adult Plaintiffs and Infant Plaintiffs. However, where a "particular Amendment provides an explicit textual source of constitutional protection against a particular sort of behavior, that Amendment, and not the more generalized notion of substantive due process, governs." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). As discussed further below, Infant Plaintiffs' removal and A.E.'s investigatory testing are cognizable as a search and seizure under the Fourth Amendment. Therefore, these claims must be analyzed under the standard appropriate to the Fourth Amendment, *see Tenenbaum*, 193 F.3d at 600, and only Adult Plaintiffs may properly assert substantive due process claims.

parent in the custody of his or her children. *See Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). But no matter how strong the parental interest in family integrity, such interest is counterbalanced by the government's compelling interest in the protection of children, "particularly in circumstances where the protection is considered necessary as against the parents themselves." *Wilkinson v. Russell*, 182 F.3d 89,104 (2d Cir. 1999). Moreover, "protective services caseworkers [must] choose between difficult alternatives in the context of suspected abuse," *Van Emrik v. Chemung Cnty. Dept. of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990), and thus courts recognize the need for "unusual deference in the abuse investigation context." *Kia P.*, 235 F.3d at 758–59. Therefore, as long as caseworkers have a "reasonable basis for their findings of abuse," substantive due process is satisfied. *Id.*

Substantive due process claims in the child-removal context also have a temporal element. Because substantive due process prohibits only the most severe state interference, "brief removals [of a child from a parent's home] generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." *Southerland*, 2011 U.S. App Lexis 11942, at *58–59. This principle applies to an even greater degree when the brief separation is relatively non-disruptive to the child/parent relationship. *See Joyner ex rel. Lowry v. Dumpson*, 712 F.2d 770, 778 (2d Cir. 1983) (upholding, against a substantive due process challenge, New York's mandatory custody transfer requirement, because it did "not result in [the] parents' wholesale relinquishment of their right to rear their children").

Even assuming defendants did not have a reasonable basis for not releasing A.E., the brief, relatively non-disruptive nature of the detention merits dismissal of plaintiffs' claim. *See Nicholson v. Scoppetta*, 344 F.3d 154, 172 (2d Cir. 2003) (holding a three-day *ex parte* detention

reasonable, as a matter of law, solely because "brief removals generally do not rise to the level of a substantive due process violation"). As described above, defendants did not hold A.E. in their capacity as state actors until after the MRI was cancelled on November 29. This resulted in, at most, a three-day period prior to court confirmation. Moreover, during this period, although defendants did not medically clear him for release, plaintiffs do not dispute that they were allowed unfettered access to see and care for A.E. Therefore, as a matter of law, defendants' "detention" of A.E. for three days, two of which A.E. was on a state-ordered social hold, was not so outrageous that it shocks the conscience.

Defendants' motion for summary judgment on plaintiffs' substantive due process claim based on defendants' removal of A.E. is therefore granted.

## 2.  Infant Plaintiffs' court-ordered removal

Infant Plaintiffs' court-ordered removal is substantially different. Unlike A.E.'s hospital stay, Infant Plaintiffs' court-ordered removal was neither short-lived nor non-disruptive. It is undisputed that Adult Plaintiffs were without custody of Infant Plaintiffs for nearly ten months, during which time they had only limited, monitored access to their children. At least four months of this time, Infant Plaintiffs were placed in foster care.

As discussed above, the State has a compelling interest in the protection of children. Moreover, courts must be "especially sensitive to the pressurized circumstances routinely confronting caseworkers, circumstances in which decisions between difficult alternatives often need to be made on the basis of limited or conflicting information." *Wilkinson*, 182 F.3d at 105. Nevertheless, these considerations are "not so compelling as to derogate a parent's constitutional rights completely." *Id.* at 104. For instance, "[c]aseworkers cannot be free to substantiate a

claim of abuse . . . by ignoring overwhelming exculpatory information or by manufacturing false evidence." *Id.*

Here, plaintiffs have presented evidence from which a jury could reasonably infer that Dr. Jenssen both ignored significant exculpatory evidence *and* manufactured a false or reckless diagnosis. For instance, prior to Jenssen's diagnosis, at least two doctors had stated their opinion that A.E.'s injuries reflected a low probability of abuse. Moreover, none of the extensive additional tests performed on A.E. exhibited any signs of abuse. And the one test (an MRI) which could have affirmatively ruled out abuse and which was recommended by several doctors, including a specialist, was cancelled, possibly by Jenssen. And finally, regarding her diagnosis, upon which both ACS and the Family Court relied, plaintiffs have presented evidence that Jenssen stated that A.E.'s injury could not have been caused by a fall and that it was consistent with a "grab and shake." Even more importantly, plaintiffs have presented evidence that neither of these conclusions is supported by medical evidence. The only basis Jenssen had to substantiate her alleged claim of abuse was the fact that A.E. presented with an unexplained buckle fracture that was 7-10 days old. And plaintiffs have presented expert testimony that such a fracture could not be caused by abuse, but instead only by a "direct impact fall." *See* Wolpin Dep. Tr., Pls.' Ex. 2, at 110:2–24. I cannot say, as a matter of law, in light of all the surrounding evidence, that Dr. Jenssen had a reasonable basis for her alleged statements and actions, in concert with ACS, when the removal petition was filed in Family Court.

That the Family Court granted ACS's petition, thereby "confirming" that there existed a reasonable basis for removal, does not mandate a different result. In *Southerland*, the Court of Appeals held that the "removal of a child does not violate the parent's substantive due process rights if a post-removal judicial proceeding is promptly held to confirm that there exists a

reasonable basis for removal." *Southerland*, 2011 U.S. App. LEXIS 11942, at *60. However, when the facts upon which the judicial tribunal relies are themselves false or misleading, court confirmation will not "suffice to show that [the caseworker's] conduct had an objectively reasonable basis." *Id.* at *64. Here, both the ACS petition and the Family Court removal order expressly relied on Jenssen's alleged statement that the injury was consistent with A.E. being grabbed and shaken. Because it is unclear whether the Family Court would have issued the removal order in the absence of this statement, the removal order does not preclude liability.

### 3. Qualified immunity

Defendants claim that, even if they violated plaintiffs' rights, they are entitled to qualified immunity. Qualified immunity shields government officials from liability for constitutional violations when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The basis for qualified immunity is the need to preserve the efficient functioning of government. Qualified immunity "acts to safeguard government and thereby protect the public at large, not to benefit its agents." *Wyatt v. Cole*, 504 U.S. 158, 167–68 (1992). The concern is that subjecting public officials to liability for discretionary functions would cause them to be overly cautious and prevent them from exercising "principled and fearless decision-making." *Wood v. Strickland*, 420 U.S. 308, 319 (1975). Because these principles do not apply with equal force to private individuals who may, for limited purposes, be considered state actors, courts have struggled in determining whether, and to what degree, private parties may be eligible for qualified immunity protection.

The Supreme Court first addressed the issue in *Wyatt*. There, the plaintiff, who brought an action under 42 U.S.C. § 1983, alleged that the defendant, a private citizen, conspired with

state officials to invoke a replevin statute in order to seize plaintiff's property. The private defendant claimed he was entitled to qualified immunity. After considering the history and policy of qualified immunity, the court found that qualified immunity "rationales are not transferrable to private parties." *Wyatt*, 504 U.S. at 168. The Court, therefore, held that "private defendants faced with § 1983 liability for invoking state replevin, garnishment, or attachment statute[s]" were not entitled to qualified immunity. *Id.* at 168–69.

In the years following *Wyatt*, courts found "some question as to how broadly *Wyatt* should be read," *Toussie v. Powell*, 323 F.3d 178, 183 (2d Cir. 2003), that is, whether *Wyatt* should be read broadly, to preclude all private parties from invoking qualified immunity, or more narrowly, precluding only those private defendants alleged to have invoked state replevin statutes. In *Toussie*, the Second Circuit, at least partially, answered this question. There, the Court held that, "[w]hatever the precise holding of *Wyatt* may be, its logic applies as much to allegations that a private defendant conspired to influence improperly governmental decision-making as it does to allegations that a private defendant invoked a state replevin [statute]." *Id.* at 183. The court went on to hold that "a private defendant faced with § 1983 liability for conspiring with state officials to violate federal rights is not protected by the doctrine of qualified immunity." *Id.*

Therefore, defendants are not entitled to qualified immunity for their alleged conspiracy to violate plaintiffs' substantive due process rights.

### E.    Fourth Amendment Claims

Infant Plaintiffs[12] claim that defendants violated their Fourth Amendment rights when they: (1) detained A.E. for purely investigatory reasons; (2) performed tests on A.E. for purely

---

[12]    Adult Plaintiffs do not have standing to assert Fourth Amendment claims on their own behalf. *Tenenbaum*, 193 F.3d at 602. They do, however, have standing to bring Fourth

investigatory reasons; and (3) obtained a court order removing Infant Plaintiffs from Adult Plaintiffs' custody.

### 1. A.E.'s detention at Schneider

#### a. Constitutional violation

The Fourth Amendment protects "the people" from "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized."[13] Fourth Amendment protections apply in the context of the seizure of a child by a government official during a civil child-abuse investigation. *Kia P.*, 235 F.3d at 762. A "seizure" occurs where, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Although defendants assert that Adult Plaintiffs could not have reasonably believed they were not free to take A.E., plaintiffs have presented evidence that Antoine asked when she could take A.E. home, since A.E. appeared to be fine and playing in his crib. *See* Antoine Dep. Tr., Pls.' Ex. 1, at 74, 79. Moreover, plaintiffs have presented evidence that, as of November 29, defendants had cancelled the only test that was for medical purposes; contacted ACS to report abuse allegations; and were holding and testing A.E. pursuant to hospital and ACS abuse policies and in anticipation of an ACS social hold. Indeed, the substance of the hospital's "Protective Custody" policy is nearly identical to that of New York Social Service Law § 417, which allows ACS to place a social hold, without parental consent, on children whom the employee reasonably believes are in imminent danger. If Hospital Defendants were holding A.E. pursuant to this

Amendment claims on their children's behalf. *See Southerland*, 2011 U.S. App. LEXIS 11942, at *33.

[13] The Fourth Amendment's search and seizure provisions are applicable to defendants through the Fourteenth Amendment's Due Process Clause. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

policy and in order to "rule out abuse," they would not, in fact, have returned A.E. to his parents. Viewing this evidence in the light most favorable to plaintiffs, plaintiffs have created a factual issue[14] as to whether defendants took actions that would lead a reasonable parent to believe, on behalf of their child, that the child was not free to leave the hospital.[15]

Any seizure of A.E. did not implicate the Fourth Amendment's protections until the MRI was cancelled on November 29. This was the first day that defendants were potentially acting solely as state actors. Defendants claim that, even if they did seize A.E. at that time, the seizure was reasonable. The Second Circuit has yet to decide definitively the appropriate standard by which to assess the reasonableness of a seizure in the context of a child abuse investigation. In some cases, the Circuit has applied the traditional probable cause standard. *See Tenenbaum*, 193 F.3d at 604. It has left open, however, the possibility that a lesser, reasonable person standard may apply. *Id.* ("There may be circumstances in which the law of warrant and probable cause . . . does not work effectively in the child removal [context].") I also need not decide definitely which standard applies. Even assuming the more lenient "reasonable person" standard applies to A.E.'s seizure, plaintiffs, for the reasons already discussed above as they applied to plaintiffs' substantive due process claim, have presented an issue of material fact as to whether defendants acted without a reasonable basis in their determination to seize A.E.

Defendants rely on language in *Kia P.* that the "the Hospital's short-term custody of [the infant] pending its report of the negative drug-test result and medical clearance to CWA and CWA's subsequent deliberation about whether to hold Mora was reasonable." *Kia P.*, 235 F.3d at 762–63. In *Kia P.*, however, the CWA already had a social hold on the child because of the

---

[14] The determination of whether a seizure occurred is a question of law, to be decided by the court. The circumstances underlying that determination, however, are questions of fact to be left to the jury. *Brown v. City of Oneonta*, 235 F.3d 769, 776 n.2 (2d Cir. 2000)

[15] Even if A.E. were not seized as of November 29, he was clearly seized as of November 30, when ACS instructed defendants to place him on a social hold.

positive urinalysis—*i.e.*, evidence that would have provided probable cause (or a reasonable basis) to detain the infant, and the Court merely held that, for purposes of Fourth Amendment analysis, it was reasonable to allow the hospital two days in order to process the new, negative (and therefore exculpatory) test results, and allow CWA to decide whether to continue its social hold on the child.

Here, there is a genuine dispute as to whether defendants, absent a medical purpose, would have ever had a sufficient basis (reasonable or probable) for seizing A.E. Unlike *Kia P.*, where the Court of Appeals allowed the hospital and ACS time to process new and conflicting test results, here, there was only one set of operative facts: a 7-10 day old, unexplained buckle fracture. If A.E.'s injury, by itself and in light of the surrounding evidence, did not provide the hospital (or ACS) a reasonable basis for seizing A.E., then any seizure of A.E., no matter how short-lived, could not withstand Fourth Amendment scrutiny. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention . . . .") As discussed above, plaintiffs have presented an issue of fact as to whether A.E.'s injury provided a reasonable basis for the hospital's suspicion of abuse.

### b.    Qualified immunity

Unlike qualified immunity as it pertains to private-actor/state-actor § 1983 conspiracies, the Second Circuit has not determined whether private actors are entitled to qualified immunity when they are performing government functions. *See Toussie*, 323 F.3d at 184 (declining, as did the Supreme Court in *Wyatt*, to "rule on whether a private individual briefly associated with a government body, serving as an adjunct to government in an essential government activity, or acting under close official supervision might enjoy [qualified] immunity").

As discussed above, the purpose of qualified immunity is to protect the "vigorous exercise of official authority." *Butz v. Economou*, 438 U.S. 478, 506 (1978). Accordingly, the Supreme Court has twice, on the only occasions it has had to decide the issue, found that private parties acting under color of state law were not protected by qualified immunity. *See Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (private prison guards under contract with the state); *Wyatt*, 504 U.S. at 168. In declining to extend qualified immunity, the Court has looked at whether the "tradition of immunity was so firmly rooted in common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *Wyatt*, 504 U.S. 164. In examining policy considerations, the Court found it significant that the private actors held no office "requiring them to exercise discretion," were not principally concerned with enhancing the public good," *see Wyatt*, 504 U.S. at 168, and that their activities were "undertaken . . . for profit," and motivated by "competition with other firms." *Richardson*, 521 U.S. at 413.

Following these cases, most courts have rejected private actors' claims of qualified immunity. *See Bender v. Gen. Servs. Admin.*, 539 F. Supp. 2d 702, 714 (S.D.N.Y. 2008) (collecting cases). However, in those instances where courts have accorded qualified immunity to private actors, it has been where the private party's actions were isolated, taken at the specific direction of the government, or done without profit or other marketplace incentive. *See, e.g., Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 73 (2d Cir. 1998) (granting official immunity to private administrators of federal Medicare claims in their efforts to detect fraud because they were "acting as adjunct in an essential government activity" and they had "no personal financial interest" in finding such fraud); *Mejia v. City of N.Y.*, 119 F. Supp. 2d 232, 266–68 (E.D.N.Y. 2000) (allowing a claim of qualified immunity by private actors enlisted by

law enforcement officers to assist in making an arrest). Applying these considerations, I find that defendants fall within the narrow category of private actors who may claim qualified immunity.

Insofar as defendants detained and tested A.E. for investigatory purposes, they were acting "as part of the reporting and enforcement machinery for CWA . . . ." *Kia P.*, 235 F.3d at 757. And, when state caseworkers investigate abuse, they perform what is "fundamentally a police function," and have therefore been granted qualified immunity. *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010). There is therefore a tradition of granting immunity to individuals performing the function in which defendants were engaged.[16]

In addition, defendants were not under contract with the state, but rather, they investigated only isolated instances of abuse that required an exercise of discretion which the public has a strong interest in remaining unfettered. Because defendants do not profit from their role in child abuse investigations, the competitive pressures of the market are highly unlikely to constrain their decision-making.[17] If abuse team workers at hospitals were subjected, without protection, to lawsuits for any erroneous decision, they would likely under-report cases of suspected abuse, which would cost them nothing, instead of investigating and reporting the

---

[16]     In *Richardson*, the court held that, because "correctional functions have never been exclusively public," the fact that the private prison guards performed the same function as government prison guards did not automatically afford the private guards the same immunity. *Richardson*, 521 U.S. at 405. However, unlike in *Richardson*, here, defendants *were* performing a function that is traditionally exclusively a public function. *See Kia P. v. McIntyre*, 2 F. Supp. 2d 281, 288 (E.D.N.Y. 1998) (holding that because the "Hospital had implemented a policy of holding children who were the subject of child abuse investigations, even if there was no medical reason for doing so," "the Hospital and its employees were performing a function that was essentially public in nature").

[17]     Plaintiffs point to the fact that the hospital received approximately $10,000 from its allegedly investigatory testing of A.E. This fact, however, does not bear on the policy concern at issue in *Richardson*. The investigation of child abuse claims is not a profit-making function of the hospital, and therefore competitive market pressures are unlikely to constrain defendants' decision-making in this context. The revenues associated with the tests that are administered during abuse investigations are tangential to the investigatory function.

abuse, thereby opening themselves to the potential of a costly lawsuit. I find, therefore, that defendants are eligible for qualified immunity.

The question is then, whether defendants are, as a matter of law, entitled to qualified immunity. In order to be protected by qualified immunity, defendants must show that either: (1) their conduct did not violate clearly established rights of which a reasonable person would have known; or (2) it was objectively reasonable to believe that their actions did not violate these clearly established rights. *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). A right is clearly established if it is "defined with reasonable specificity," if "the decisional law of the Supreme Court or the appropriate circuit court has clearly established the right" and if "in light of preexisting law the unlawfulness of the defendant official's actions is apparent." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989).

A.E.'s Fourth Amendment right against an unreasonable seizure in the context of a child abuse investigation has been clearly established since at least 1999, *see Tenenbaum*, 193 F.3d at 603–05, and has been applied in the context of a hospital seizure since at least 2000. *See Kia P.*, 235 F.3d at 762. Both dates are well before defendants' actions in this case.

As I held above, there is a fact issue as to whether defendants' conduct violated those rights. And, if the fact issue is decided in plaintiffs' favor, it would not have been objectively reasonable for defendants to believe that they were not violating plaintiffs' rights. The seizure in this case is unusual because defendants had physical custody of A.E. both before and after the seizure. However, if, as plaintiffs have presented evidence to suggest, there was never a reasonable basis to suspect abuse, then, as soon as the MRI was cancelled on November 29,

defendants were under a clear and established obligation to return A.E. to his parents.[18] Plaintiffs have therefore presented sufficient evidence to preclude summary judgment on this claim.

### 2. The testing of A.E.

#### a. Constitutional violation

As discussed above regarding state action, plaintiffs have presented a material issue of fact as to whether the medical examination of A.E., after the initial x-rays, served solely an investigative function. Moreover, they have presented evidence that A.E.'s seizure and testing were conducted pursuant to hospital abuse policy and in conjunction and/or anticipation with ACS's abuse investigation. Therefore, because plaintiffs have produced evidence that defendants performed the tests in connection with their "social welfare role," *see Kia P.*, 235 F.3d at 756, "in the absence of a warrant equivalent . . . reasonable or probable cause or exigent circumstances justifying an emergency examination must have existed at the time the examination was performed." *Tenenbaum*, 193 F.3d 581. For the reasons discussed above regarding substantive due process and Fourth Amendment seizure, plaintiffs have presented an issue of material fact as to whether there existed a reasonable basis for performing purely investigatory tests on A.E.

#### b. Qualified immunity

A.E.'s Fourth Amendment right against unreasonable investigatory testing has been clearly established since at least *Tenenbaum*, in 1999. Furthermore, *Tenenbaum* expressed in no uncertain terms that, in the absence of a warrant, reasonable cause, at a minimum, was necessary to perform invasive medical tests pursuant to a child abuse investigation. If defendants did not

---

[18]     As discussed above, the Second Circuit requires *at least* a reasonable basis for suspecting abuse prior to seizure of a child, but in other, similar circumstances, has held defendants to the higher, warrant and probable cause standard. *See Tenenbaum*, 193 F.3d at 604.

have a reasonable basis for suspecting abuse, they could not have reasonably believed they were not violating A.E.'s rights. They are therefore not, as a matter of law, entitled to qualified immunity.

### 3. The court-ordered removal of Infant Plaintiffs

#### a. Constitutional violation

Generally, the removal of a child from his parents' custody is reasonable, for purposes of the Fourth Amendment, if it is effectuated pursuant to a court order. *See Hernandez v. Foster*, 2011 U.S. App. LEXIS 17861, at *22 (7th Cir. 2011). However, when caseworkers, in their petition for removal, make intentionally or recklessly false statements that are necessary to a court's finding of probable cause, they are subject to Fourth Amendment liability. *See Southerland*, 2011 U.S. App. LEXIS 11942, at *47 (denying summary judgment for an allegedly illegal search based on a removal petition, where there were issues of material fact as to whether the caseworker "knowingly or recklessly made false statements in his affidavit" and as to whether "such false statements were necessary to the court's finding of probable cause"); *Greene v. Camreta*, 588 F.3d 1011, 1034 (9th Cir. 2009) (holding that a removal order effectuated "pursuant to judicial deception violates the Fourth Amendment").

Here, plaintiffs have presented a genuine issue of material fact as to whether the petition for removal was either intentionally or recklessly false, as the result of defendants' conduct, when it stated that A.E.'s injuries were consistent with being grabbed and shaken. Because the removal order expressly mentioned this diagnosis as one of only two bases for removal, I cannot say, as a matter of law, that it was not material to the Family Court's decision to seize Infant Plaintiffs.

#### b. Qualified immunity

Plaintiffs' Fourth Amendment claims based on the Family Court's removal order are dependent on their theory that defendants were joint conspirators with ACS caseworkers. Defendants are therefore not entitled to qualified immunity on this claim. *See supra*, at 21–22. Defendants' motion to dismiss plaintiffs' Fourth Amendment claims is denied.

**F.    Malicious Prosecution**

In addition to their state law claim for malicious prosecution, discussed further below, Adult Plaintiffs also bring a malicious prosecution claim under § 1983, premised on a violation of the Fourth Amendment. In order to prevail on a § 1983 claim for malicious prosecution, a plaintiff must establish the elements of a malicious prosecution claim under state law *and* a seizure under the Fourth Amendment. *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) ("In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment."); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995); *see also Albright*, 510 U.S. at 274 (refusing to recognize a malicious prosecution claim in the context of a substantive due process violation).

Here, Adult Plaintiffs have presented no evidence that they were seized or restrained, or that they had their Fourth Amendment rights otherwise violated in any way. Moreover, despite their argument to the contrary, plaintiffs point to no authority, and the court has found none, that supports the proposition that a plaintiff alleging malicious prosecution under § 1983 can assert the Fourth Amendment rights of another (here, Infant Plaintiffs). *See Emerson v. City of N.Y.*, 740 F. Supp. 2d 385, 392 (S.D.N.Y. 2010) (dismissing a § 1983 malicious prosecution claim in the context of an abuse investigation, where plaintiff father had not himself been seized).

In short, Adult Plaintiffs have not been seized, and Infant Plaintiffs have not been prosecuted. Defendants' motion for summary judgment on plaintiffs' § 1983 malicious prosecution claim is therefore granted.

### III.    Plaintiffs' Claims Under New York State Common Law

Plaintiffs allege claims, under New York state common law, for malicious prosecution, medical malpractice, gross negligence, and unlawful imprisonment.

#### A.    Malicious Prosecution

Defendants argue, and plaintiffs do not appear to dispute, that plaintiffs' malicious prosecution claim is untimely. Under New York law, a claim for malicious prosecution must be commenced within one year. N.Y.C.P.L.R. § 215(3). A malicious prosecution claim accrues when the proceeding in question terminates favorably for the plaintiff. *Bumbury v. City of N.Y.*, 62 A.D.3d 621 (1st Dep't 2009). As defendants point out, it is undisputed that ACS terminated the Family Court proceedings on September 16, 2005. Plaintiffs did not commence this action until December 13, 2006. Defendants' motion for summary judgment on plaintiffs' state law claim for malicious prosecution is therefore granted.

#### B.    Unlawful Imprisonment

As an initial matter, defendants argue that plaintiffs' claim for unlawful imprisonment is barred under the same analysis as plaintiffs' malicious prosecution claim. However, unlike plaintiffs' malicious prosecution claim, Adult Plaintiffs bring their unlawful imprisonment claim on behalf of A.E., an infant. Under New York law, the statute of limitations is tolled during infancy, *see* N.Y.C.P.L.R. § 208, and New York courts have applied this tolling statute in the specific instance of the unlawful imprisonment of minors. *See Lauver v. Cornelius*, 85 A.D.2d 866 (3d Dep't 1981). Plaintiffs' unlawful imprisonment claim is therefore timely.

To establish a claim of false imprisonment, plaintiffs must demonstrate that the hospital intended to confine A.E., that A.E. was conscious of the confinement, that he did not consent to the confinement and that the confinement was not otherwise privileged. *Miriam P. v. New York*, 163 A.D.2d 39 (1st Dep't 1990). Defendants argue that plaintiffs have failed to adduce any evidence that A.E. was aware of his confinement. In response, plaintiffs point to no evidence that would create an issue of fact as to whether A.E. was aware of his confinement. Summary judgment is therefore appropriate. *See Celotex v. Catrett*, 477 U.S. 317, 324 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an [essential element] on which that party will bear the burden of proof at trial."); *Sager v. Rochester Gen. Hosp.*, 169 Misc. 2d 643, 646 (N.Y. Sup. Ct. 1996) (granting summary judgment on a false imprisonment claim where, among other things, "there was no proof that [a] five-month-old child was conscious of her confinement"). [19]

## C.    Medical Malpractice

To make out a prima facie case of medical malpractice, a plaintiff must show that a defendant deviated from accepted medical practice and that the alleged deviation proximately caused injury or death. *Bacani v Rosenberg*, 74 A.D.3d 500, 501 (1st Dep't 2010). At the summary judgment stage, if a defendant produces evidence either that he did not deviate from accepted practice or that such deviation was not the proximate cause of the plaintiff's injuries, the burden shifts to the plaintiff to "submit a physician's affidavit of merit attesting to a departure from accepted medical practice *and* containing the attesting doctor's opinion that the

---

[19]    Plaintiffs have produced a single case, from 1911, to support the proposition that a child's parents' awareness of the child's confinement is sufficient to satisfy the consciousness prong. *See* Pls.' Mem. of Law, at 44 (citing *Barker v. Washburn*, 200 N.Y. 280 (1911)). To the extent that *Barker* can be read to support plaintiffs' argument, it is clear from cases much more recent, *e.g. Sager*, that this proposition no longer represents New York law.

defendant's omissions or departures were a competent producing cause of the injury." *Id.* (emphasis added).

Here, defendants have provided evidence, in the form of expert opinion, to establish that they did not deviate from accepted medical practice. Defendants' expert also asserts that, even if osteomyelitis were properly identified, the break would have remained suspicious to ACS. In response, plaintiffs have submitted the deposition testimony and medical evaluation of their own expert, Dr. Martin Wolpin, who testified that it was a deviation from accepted practice to cancel the MRI and to not perform more definitive testing in the face of the available evidence of the fracture. He testified that, had defendants performed more definitive testing, including an MRI, they would have been able to accurately diagnosis A.E.'s injury as having been caused by osteomyelitis. Furthermore, Dr. Wolpin testified, although the misdiagnosis that resulted from defendants' failure to perform more definitive testing did not cause A.E. physical harm, it did lead to the call to the State Register, which ultimately "formed the basis for the ACS to file a charge of child abuse by the parents and [led to] the subsequent removal of [Infant Plaintiffs] from the parental care." *See* Wolpin Medical Evaluation, Pls.' Ex. 3.

Defendants argue that even if they deviated from accepted medical practice, such deviation could not be the cause of Infant Plaintiffs' injuries because it is unclear whether Dr. Jenssen's diagnosis caused the removal of Infant Plaintiffs. For the reasons discussed above, this argument is rejected.

Defendants' motion for summary judgment on plaintiffs' medical malpractice claim is therefore denied.

## D.    Gross Negligence

Under New York law, gross negligence is defined as "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Colnaghi, USA. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823–24 (N.Y. 1993). Defendants argue that they were not grossly negligent, but rather, merely filed a report of suspected abuse, as required under New York law. As discussed above, plaintiffs have produced evidence that defendants ignored exculpatory information, performed harmful testing without any basis for believing it was necessary, and that they conveyed to both ACS and the Family Court a diagnosis with no basis in fact. From this evidence a reasonable jury could conclude that defendants, at a minimum, recklessly disregarded the rights of plaintiffs. Defendants' motion for summary judgment on plaintiffs' gross negligence claim is therefore denied.

## E.    Immunity Under New York State Law

Finally, defendants argue that plaintiffs' state law claims should be dismissed because, under New York law they are immune from liability for their mandated report and related actions.

Under New York law:

> Any person, official, or institution participating in . . . the removal or keeping of a child pursuant to this title, or the disclosure of child protective services information . . . shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, . . . the good faith of any such person . . . shall be presumed, provided . . . that such liability did not result from the willful misconduct or gross negligence of such person . . . .

N.Y. Soc. Serv. Law § 419. Even assuming that all of defendants' conduct is covered by § 419, plaintiffs have, as discussed extensively above, provided sufficient evidence to create a genuine issue of material fact as to whether defendants acted with willfulness or in a grossly negligent

manner, thereby excluding them from § 419's coverage. Defendants' claim of statutory immunity as a matter of law is therefore rejected.

## CONCLUSION

In sum, defendants' motion for summary judgment is granted in part and denied in part. It is granted to the extent that the following claims are denied: plaintiffs' procedural due process claims, § 1983 malicious prosecution claims, state law malicious prosecution claims, and unlawful imprisonment claims. Defendants are also granted summary judgment dismissing plaintiffs' substantive due process claims, as they relate to A.E.'s admission and alleged detention at Schneider.

The motion is otherwise denied and the following claims will proceed to trial: Infant Plaintiffs' Fourth Amendment claims, all plaintiffs' substantive due process claims as they relate to the court-ordered removal, Infant Plaintiffs' medical malpractice claims, and Infant Plaintiffs' gross negligence claims. Defendants' claims of qualified and statutory immunity may go forward with regard to Infant Plaintiffs' Fourth Amendment claims as they relate to the seizure and testing of A.E. (qualified), as well as their medical malpractice and gross negligence claims (statutory).

The parties are directed to confer and submit a schedule for a joint pre-trial order. Alternatively, the parties may advise the court if they wish to proceed to mediation or settlement negotiations with Magistrate Judge Mann.

SO ORDERED.

s/NG

**NINA GERSHON**
**United States District Judge**

Dated:   December 23, 2011
         Brooklyn, New York